FILED

2018 MAR 23  AM 11: 11

CLERK. US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS FLORIDA

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

DERETHA MILLER, LUETRICIA FREEMAN )
BECKER, RALPH HENRY, and NOEMY )
RODRIGUEZ, individually, and on behalf of a )
class of persons similarly situated, )
                         )
                Plaintiffs, )
                         )
v.                           )    Case No:
                          )    2:18 CV-195-FtM- 38CM
THE CITY OF FORT MYERS, a Municipality, )
MAYOR RANDALL P. HENDERSON JR., in )
his official capacity as City of Fort Myers Mayor, )
and SAEED KAZEMI, in his official capacity )
as City of Fort Myers Manager, )
                          )
                Defendants. )

## INDIVIDUAL AND CLASS ACTION COMPLAINT
## AND DEMAND FOR JURY TRIAL,
## INJUNCTIVE RELIEF SOUGHT

Plaintiffs, as individuals, and on behalf of a class of other people similarly situated bring this action against the City of Fort Myers, Florida, ("City" or "Fort Myers") and its Mayor and City Manager in their official capacities, and allege as follows:

### STATEMENT OF THE CASE

1.      This is an individual action on behalf of the named plaintiffs under the citizen suit provision of the federal Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(A), to enforce the prohibition in RCRA against "open dumps." Plaintiffs seek an enforcement order from the Court to require the removal of arsenic contaminated sludge, soil, and groundwater from the property consisting of one (1) city

block located on the south side of South Street, between Midway Avenue and Henderson Avenue, in the Dunbar neighborhood of the City of Fort Myers, Lee County (the "Dunbar Site" or "Sludge Dump") where the City continues to maintain an open dump in violation of RCRA.

2.      This is an individual action on behalf of named plaintiffs under the citizen suit provision of the RCRA, 42 U.S.C. § 6972(a)(1)(B), which authorizes private persons to sue those responsible for disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment, to compel a comprehensive investigation and cleanup of the City's Sludge Dump.

3.      This is a class action on behalf of named plaintiffs and other persons similarly situated under Fed. R. Civ. P. 23 and Florida law for negligence, strict liability, private nuisance, failure to warn, and medical monitoring, as a result of the disposal of arsenic contaminated sludge by the City in the Dunbar neighborhood of the City of Fort Myers. Plaintiffs and those similarly situated seek damages for diminution of property values, loss of use and enjoyment of property, annoyance, discomfort, and inconvenience, and seek the establishment of a court-supervised fund paid for by the City for establishment of a medical monitoring program for the class of persons who have been exposed to arsenic as a result of the City's disposal of sludge at the Dunbar Site.

**JURISDICTION AND VENUE**

4.      This Court has subject matter jurisdiction over the RCRA claims set forth in this Complaint pursuant to Section 7002(a)(1)(A) of RCRA, 42 U.S.C. § 6972(a)(1)(A), and 28 U.S.C. § 1331.  Venue is also appropriate in the Middle District of

2

Florida, pursuant to Section 7002(a) of RCRA, 42 U.S.C. § 6972(a), because the violations complained of herein have occurred and continue to occur within this judicial district.

5.    This Court has supplemental jurisdiction over Plaintiffs' claims of negligence, strict liability, private nuisance, failure to warn, and medical monitoring arising under Florida law, pursuant to 28 U.S.C. § 1367(a).

6.    Plaintiffs have complied with the pre-suit notice provisions of RCRA. Pursuant to Section 7002(b)(1)(A) of RCRA, 42 U.S.C. § 6972(b)(1)(A), on November 30, 2017, Plaintiffs mailed a notice of intent to file suit under RCRA to address the violations at the arsenic Sludge Dump to Defendant City of Fort Myers, the Administrator of the U.S. Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Director of the Florida Department of Environmental Protection ("FDEP"), (attached hereto as Exhibit "A" and incorporated by reference herein). More than ninety (90) days have passed since the notice was served on the City and these agencies.

7.    Neither EPA nor FDEP has commenced nor are they diligently prosecuting a civil or criminal action in a court of the United States to redress the violations of the RCRA by the City for the maintenance of an open dump on the Dunbar Site.

8.    The EPA has not commenced, nor is it prosecuting, a civil action in a court of the United States under 42 U.S.C. § 6973 or under 42 U.S.C. § 9606 to address the imminent and substantial endangerment to health or the environment. EPA has not

3

engaged in a removal action nor incurred costs to initiate a Remedial Investigation and Feasibility Study under 42 U.S.C.A. § 9604. EPA has not obtained a court order (including a consent decree) or issued an administrative order under 42 U.S.C. § 9606 or 42 U.S.C. § 6973, pursuant to which the City is conducting a removal action, Remedial Investigation and Feasibility Study, or proceeding with a remedial action on the Dunbar Site.

9.      The FDEP has not commenced, nor is it prosecuting, an action under 42 U.S.C. §6972(a)(1)(B) to address the imminent and substantial endangerment to health or the environment; nor is FDEP actually engaging in a removal action under 42 U.S.C. § 9604; nor has FDEP incurred costs to initiate a Remedial Investigation and Feasibility Study under 42 U.S.C. § 9604 on the Dunbar Site.

10.     For the pendent state law negligence, strict liability, private nuisance, failure to warn, and medical monitoring claims, Plaintiffs and those similarly situated have given the City the required notice pursuant to Fla. Stat. § 768.28, by mailing two statutory notices of intention to file suit on or about July 25, 2017, and an amended notice on or about March 11, 2018 (attached hereto as Exhibit "B" and incorporated by reference herein).

11.     Venue is appropriate in this District Court because the endangerment and the violations occurred and are occurring in this judicial district.

## PARTIES

12.     Plaintiff Deretha Miller is a citizen of Lee County, Florida, and resides and owns property at 3442 South St., Fort Myers, FL 33916. Plaintiff has lived on South

Street in the vicinity of the City's Sludge Dump since on or about 1998. Plaintiff has owned her property since on or about 2001. Plaintiff sues on behalf of herself and as a representative of the proposed Property Damages and Exposure to Arsenic Contaminated Sludge Classes.

13.     Plaintiff Luetricia Freeman Becker is a citizen of Lee County, Florida, and owns property at 3425 South St., Fort Myers, FL 33916. Plaintiff has lived on South Street in the vicinity of the City's Sludge Dump since on or about 1970. As a child, Plaintiff played on the Dunbar Site from on or about 1970-1975. Plaintiff has owned the property since on or about 2015. Plaintiff sues on behalf of herself and as a representative of the proposed Property Damages and Exposure to Arsenic Contaminated Sludge Classes.

14.     Plaintiff Ralph Henry is a citizen of Lee County, Florida, and resides at 11338 SW 167 St., Miami, FL 33157 in Miami Dade County Florida, and owns property located at 3320 South St., Fort Myers, FL 33916. Plaintiff owns property on which the City dumped arsenic sludge. The City sold this property without disclosing to the buyer that the property had previously been used as a Sludge Dump. Plaintiff purchased the property without knowledge of the Sludge Dump. Plaintiff sues on behalf of himself and as a representative of the proposed Property Damages Class.

15.     Plaintiff Noemy Rodriquez is a citizen of Lee County, Florida, and resides at 2002 SW 15th Ave., Cape Coral, FL 33991. Plaintiff owns property located at 3313 Jeffcott St., Fort Myers, FL 33916. Plaintiff owns property on which the City dumped arsenic sludge. The City sold this property without disclosing to the buyer that the

property had previously been used as a Sludge Dump. Plaintiff purchased the property without knowledge of the Sludge Dump. Plaintiff sues on behalf of herself and as a representative of the proposed Property Damages Class.

16. Defendant City of Fort Myers, located in Lee County, Florida, is a municipality created under Florida law and is a "person" as defined in the RCRA, 42 U.S.C. § 6903(16). The City is subject to suit for violations of the RCRA, pursuant to the citizen suit provision, 42 U.S.C. 6972(a)(1)(A). The City is subject to suit for state law tort claims, pursuant to Fla. Stat. § 768.28.

17. The City owned the Dunbar Site at all material times to this action and dumped arsenic-laden sludge onto the Dunbar Site.

18. The City has actual knowledge of the occurrences that form the basis of this complaint and has completed an investigation related thereto.

19. The Defendant Randall P. Henderson, Jr. is the Mayor of the City of Fort Myers and is sued in his official capacity.

20. The Defendant Saeed Kazemi is the City Manager of Fort Myers and is sued in his official capacity. The City Manager is responsible for managing the day-to-day operations of the City and implementing the City policies put into effect by the City's Mayor and the City Council.

## GENERAL ALLEGATIONS

21. During the 1960s and 1970s, the City pumped water from wells in Lee County near the Dunbar neighborhood for use as drinking water and treated that water with lime to remove contaminants. During part of that time, the City pumped water from

the Caloosahatchee River and discharged it onto the surface of the ground at the wells in order to recharge the wellfield.

22.    The lime treatment of water from the City's wells produced tons of lime sludge, which was and is contaminated with arsenic.

23.    In 1962, the City purchased the approximately 4-acre property known as "Home-a-rama" on South Street in the Dunbar neighborhood for use as a dump for the "lime sludge" from lime treatment of drinking water. The Home-a-rama property, or the Dunbar Site or Sludge Dump, consists of one (1) city block located on the south side of South Street, between Midway Avenue and Henderson Avenue, in the Dunbar neighborhood of the City of Fort Myers, Lee County.

24.    The Dunbar neighborhood which surrounds the Dunbar Site is a predominantly African-American community with almost one-third of the population living below the poverty level located east of downtown Fort Myers, Florida.

25.    The City dumped at least 25,000 cubic yards of sludge on the Dunbar Site over the course of several years, in some places at least ten (10) feet deep.

26.    Some of the lots located within the Dunbar site containing the sludge were purchased by private parties as lots intended for residential use, including the property owned by Plaintiffs Noemy Rodriquez and Ralph Henry. The City never disclosed to any buyers that the property had been used as a Sludge Dump.

27.    The City's arsenic contaminated Sludge Dump has not and does not meet RCRA standards for a solid waste landfill. The Sludge Dump was neither lined to prevent migration of arsenic into groundwater nor covered to prevent the sludge from migrating to

the air and surface water. In addition, for more than fifty (50) years the sludge has remained on the Dunbar Site with unrestricted access for children and others.

28.     Until the mid-1980s, people living in the area near the Sludge Dump relied upon wells for their drinking water, and, upon information and belief, there may be some people living near the Dunbar Site who still use wells in the area.

29.     The City's sludge is contaminated with arsenic, which poses a risk to human health for the residents in the area. Sludge samples taken on or about February 2007, at the direction of the City of Fort Myers, were all above FDEP soil contamination target levels for residential property use.

30.     Both the City and FDEP were aware of these 2007 sample results, however, neither entity alerted the Plaintiffs or the Dunbar community.

31.     Groundwater on and near the Sludge Dump is also contaminated with arsenic. At the direction of the City, groundwater monitoring wells were installed in 2008, which showed groundwater contamination with arsenic of twelve (12) micrograms per liter ("µg/l") to 18.0 µg/l, greater than the FDEP groundwater cleanup target level of 10 µg/l, which is also the drinking water standard for arsenic. Groundwater samples in November 2017 showed levels as high as 53 µg/l, five times the groundwater cleanup level.

32.     In July 2008, FDEP expressed its "continuing concerns with the arsenic-impacted soils" to the City and required the City to submit a Remediation Action Plan ("RAP") or to seek approval for No Further Actions with Conditions. The City took no

action and waited nearly two years to respond, and then only responded when it was notified again by FDEP that it was required to submit a RAP.

33.    On or about May 10, 2010, FDEP notified the City that it had not submitted its RAP "to address the arsenic concentrations detected at the [Dunbar Site]." This written request for a RAP related to the Sludge Dump was prompted by an FDEP internal alert that 700 days would elapse on July 25, 2010, "without written response to [FDEP's] inquiry by the responsible party, and [that] no actions have been initiated by the [responsible party] during this time period."

34.    FDEP notes from a June 2010 meeting between FDEP and the City indicate that "[t]he [City] engineer proposed to [sic] additional monitoring for the next five (5) years without moving any material offsite. This is not acceptable and needs to show work in progress for developing a plan to remove the soil from the property."

35.    On or about July 9, 2010, the City submitted a proposed "Remedial Investigation Plan" for the Dunbar Site rather than the required RAP.

36.    Rather than remediating the Dunbar Site, the plan proposed monitoring of the Sludge Dump over the next five (5) years. At the end of that period, the City proposed that it would send a remedial action plan for FDEP approval.

37.    FDEP then suggested to the City that the Remedial Investigation Plan "be renamed as a Remedial Action Plan (RAP)." FDEP noted that when the now renamed RAP is received, the "inputs will satisfy [COMET or Compliance and Enforcement Tracking system] time sensitive alerts for the subject property." This correspondence took

place on or about July 8, 2010, which was approximately seventeen (17) days before the 700-day internal alert period would have expired.

38.     On or about July 13, 2010, the City's now renamed Remedial Action Plan was approved by FDEP.

39.     On or about July 31, 2014, in a correspondence from FDEP to the City, FDEP noted that in order for environmental closure to take place, "the buried Arsenic impacted sludge is recommended to be excavated and removed, as the sludge has the capacity to leach Arsenic to the groundwater, with possible migration . . . off-site onto the residential properties that are adjacent" to the Sludge Dump.

40.     On or about April 2, 2015, the City proposed possible mitigation strategies "for removing or cleaning up the underground pollutants" found at the Sludge Dump.

41.     At no time between 2007 and 2017 did the City or FDEP notify the Plaintiffs or Dunbar residents of the existence of the arsenic contaminated soil or the possibility of groundwater contamination. Nor did the City secure or post warning signs on the Dunbar Site. Instead the City allowed Plaintiffs and community members, including children who were known to play on the Dunbar Site, full and free access to the contaminated Dunbar Site, until after June 2017, when the press released this story to the public.

42.     In December 2017, the City installed off-site monitoring wells outside the Dunbar Site's property boundaries to the north and east of the Sludge Dump. Groundwater samples showed arsenic levels in three of the wells in excess of the groundwater cleanup standard for arsenic, with one sample nearly four times the standard.

43.    The groundwater contaminated by the City's Sludge Dump, both on the property and in the surrounding area, is an underground source of drinking water as that term is defined in RCRA.

44.    The City's arsenic Sludge Dump has contaminated an underground source of drinking water outside the solid waste boundary (the property boundary) for the City's Sludge Dump.

45.    Arsenic is a well-known poison, a proven hazardous substance, and a dangerous environmental contaminant. Exposure to arsenic produces a variety of adverse health effects. Ingesting very high levels can result in sudden death. Chronic exposure to arsenic in drinking water can cause several types of cancer. According to the Agency for Toxic Substances and Disease Registry ("ATSDR"), part of the U.S. Centers for Disease Control and Prevention, epidemiological studies have reported that individuals exposed to inorganic arsenic are at an increased risk of developing cancer. Studies have shown that exposure to arsenic in drinking water results in an elevated risk of urinary tract cancers, such as bladder cancer. Those who had been drinking arsenic-contaminated well water since birth —that is, those with the longest-term exposure —exhibited a four- to-five-fold increased risk of urinary cancers. Exposure from birth may also increase the risk of urinary cancer much later in life. This finding of a long latency period (the time that elapses from exposure until the time of illness) suggests that people whose drinking water is contaminated by arsenic should be monitored long-term for, among others, urinary tract cancer, even if they have stopped drinking the contaminated water.

46.     Exposure to inorganic arsenic can result in the development of several non-cancer adverse health effects in humans, such as respiratory symptoms, hepatomegally (swollen liver), chemically-induced hepatitis, portal hypertension of the liver, peripheral neuropathy or numbness in the toes, feet, and legs, skin rash, hyper- and hypopigmentation of the skin, hyperkeratosis of the skin, upset stomach, gastroenteritis, diarrhea, vomiting, and adverse reproduction outcomes (e.g., birth defects in infants).

47.     There is also evidence that in childhood, long-term exposure to arsenic may result in lower IQ scores and exposure to arsenic in the womb and early childhood may increase mortality in young adults.

48.     Many of arsenic's effects are dose- and time-dependent. Low levels of exposure over an extended period of time can produce effects similar to a one-time high level of exposure.

49.     Recent studies have also linked arsenic ingestion to cardiovascular disease and diabetes mellitus.

50.     In addition to arsenic-laden drinking water, arsenic can enter the body via other pathways, such as inhalation of arsenic-laden dust. Studies have shown that inhaling sawdust from construction with arsenic-treated lumber can greatly increase the danger of lung cancer, as it can be absorbed through the lungs. Inhaling arsenic from fugitive dust from dumpsites, such as the Dunbar Site, can likewise pose a danger to human health.

51.     Arsenic can also be absorbed through the skin, which is why its use in wooden decks and play equipment was outlawed. Children who play on or near arsenic

contaminated soils or where there is fugitive dust are at risk of developing the adverse health effects of arsenic exposure.

52.     Children are highly susceptible to the adverse health effects of arsenic exposure. This is due in part to their size: any exposure they suffer is more significant for their small bodies than it would be for an adult. In addition, children's organ systems, particularly the nervous system, are still undergoing development and are thus more susceptible to the effects of toxics exposure. This is particularly the case during gestation (in utero) and infancy, and it remains true throughout childhood. Children also breathe more rapidly than adults and their lungs are proportionately larger, thus increasing their susceptibility to airborne toxics. Finally, young children are prone to hand-to-mouth behaviors that expose them to higher levels of ambient contaminants, such as contaminated soils and dust.

53.     Unless the arsenic-contaminated sludge in the Dunbar Community is immediately removed and the groundwater and soil contamination are remediated, the City's Sludge Dump will continue to present an imminent and substantial endangerment to health and the environment to the detriment of the individual Plaintiffs through migration of dust and contaminated groundwater, as well as posing an ongoing risk of direct exposure due to the uncontrolled access to portions of the site on which sludge was dumped. Although the City has fenced portions of the site, there are no signs warning of the danger of toxic chemical exposure, and portions of the site remain without fencing, including parcels purchased by private parties for residential use.

54.     Plaintiffs Deretha Miller and Luetricia Freeman Becker and those persons in the Exposure to Arsenic Contaminated Sludge Class have had exposure to arsenic in greater than normal background levels. They have been exposed through drinking water from wells near the Sludge Dump. They have been exposed by breathing dust from the Sludge Dump. Some of them have been exposed through direct contact with the arsenic contaminated sludge, including children who played on the unrestricted property, who would have had skin contact and would likely have consumed contaminated sludge by hand-to-mouth contact.

55.     This exposure was caused by the City's acts and omissions as described in this Complaint.

56.     As a proximate result of the exposure, Plaintiffs in the Exposure to Arsenic Contaminated Sludge Class have a significantly increased risk of contracting serious latent diseases, including urinary cancers and lung cancer.

57.     For the Plaintiffs in the Exposure to Arsenic Contaminated Sludge Class monitoring procedures exist that make the early detection of the serious latent diseases possible.

58.     For Plaintiffs in the Exposure to Arsenic Contaminated Sludge Class the prescribed monitoring regime is different from that normally recommended in the absence of the exposure.

59.     For Plaintiffs in the Exposure to Arsenic Contaminated Sludge Class the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

14

60.    As a direct result of the City's acts and omissions regarding the Sludge

Dump, as described in this Complaint, Plaintiffs Deretha Miller, Luetricia Freeman

Becker, Ralph Henry and Noemy Rodriguez and those persons in the Property Damages

Class have suffered from and continue to suffer diminution of property values, loss of use

and enjoyment of property, annoyance, discomfort, and inconvenience.

### STATUTORY BACKGROUND

61.    The Resource Conservation and Recovery Act (RCRA) in 42 U.S.C. §

6903(14) defines the term "open dump" as:

> ... any facility or site where solid waste is disposed of which is not
> a sanitary landfill which meets the criteria promulgated under
> Section 6944 of this title and which is not a facility for disposal of
> hazardous waste.

62.    Section 4005(a) of RCRA, 42 U.S.C. § 6945(a), prohibits the operation of

an open dump for land disposal of solid waste.

63.    The term "open dump" is defined by EPA in 40 C.F.R. Part 257 to include

any facility which contaminates an underground drinking water source beyond the solid

waste boundary of the property or fails to be in full and timely compliance with a

corrective action program to adequately respond to contamination threatening human

health or the environment. *See* 40 C.F.R. Part 257.

64.    The citizen suit provision of RCRA is found in 42 U.S.C. § 6972, in which

42 U.S.C. § 6972 (a)(1)(A) provides:

> (a) In general
> Except as provided in subsection (b) or (c) of this section, any person may
> commence a civil action on his own behalf—
> (1)(A) against any person (including (a) the United States, and (b) any
> other governmental instrumentality or agency, to the extent permitted by

> the eleventh amendment to the Constitution) who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter;
> …

65. Violations of the open dumping provisions can be addressed in a federal citizen suit under 42 U.S.C. § 6972(a)(1)(A), as provided in 42 U.S.C. § 6945(a).

66. Section 7002(a)(l)(B) of RCRA, 42 U.S.C. § 6972(a)(l)(B), allows affected citizens to bring suit against:

> any person, … including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage or disposal facility, who has contributed or who is contributing, to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

### COUNT 1: VIOLATIONS OF RCRA—PROHIBITION OF OPEN DUMPS

67. Plaintiffs repeat, re-allege and incorporate by reference the common allegations of this Complaint as though fully set forth herein.

68. Plaintiffs are "persons" as defined in RCRA, 42 U.S.C. § 6903(16) and are entitled to bring a citizen suit pursuant to 42 U.S.C. § 6972(a)(1)(A).

69. Defendants City of Fort Myers, Mayor Randall P. Henderson, Jr., and City Manager Saeed Kazemi are persons who are in violation of a standard, regulation, condition, requirement or prohibition which has become effective under RCRA.

70. Defendants have violated and are violating Section 4005(a) of RCRA, 42 U.S.C. § 6945(a), by maintaining an "open dump," as that term is defined in 42 U.S.C. § 6903(14), on the Dunbar Site in the Dunbar neighborhood of Fort Myers, Florida.

71.     Defendants have contaminated an underground drinking water source beyond the solid waste boundary, *i.e.*, the boundary of the City's Dunbar Site.

72.     The City has failed to either bring the open dump into compliance with RCRA requirements or remove the solid waste and address its contamination.

73.     Defendants should be subject to an enforcement order ordering Defendants to either bring the open dump into compliance with RCRA requirements or to remove the solid waste and contaminated soil and groundwater. An enforcement order is necessary to redress the damages suffered by Plaintiffs, who own property impacted by the Sludge Dump.

74.     Defendants should be subject to the assessment of civil penalties for these RCRA violations pursuant to Sections 3008(g) and 7002(a) of RCRA, and 42 U.S.C. §§ 6928(g) and 6972(a).

75.     For the purpose of assessing the maximum penalty for which Defendants are liable, each day of Defendants' operation of an open dump constitutes a separate violation of Section 4005(a) of RCRA, pursuant to Section 3008(g), 42 U.S.C. § 6928(g), for each day on which it has occurred or will occur after the filing of this Complaint.

**COUNT 2: IMMINENT AND SUBSTANTIAL ENDANGERMENT**

76.     Plaintiffs repeat, re-allege and incorporate by reference the common allegations of this Complaint as though fully set forth herein.

77.     Plaintiffs are all "persons" as defined in RCRA, 42 U.S.C. § 6903(16) and are entitled to bring a citizen suit pursuant to 42 U.S.C. § 6972(a)(1)(B).

78.     Defendants City of Fort Myers, Mayor Randall P. Henderson, Jr., and City Manager Saeed Kazemi are persons, including a past generator, past transporter, and past and present owner and operator of a disposal facility, who have contributed or who are contributing, to the past and present transportation and disposal of solid waste which may present an imminent and substantial endangerment to health or the environment.

79.     As set out in the General Allegations, Defendants' disposal of arsenic sludge may present an imminent and substantial endangerment to health or the environment in the Dunbar neighborhood.

80.     An enforcement order or injunction requiring Defendants to fully remediate the Sludge Dump and arsenic contaminated soil and groundwater is necessary to redress the damages suffered by Plaintiffs, who own property impacted by the Sludge Dump.

## COUNT 3: NEGLIGENCE

81.     Plaintiffs repeat, re-allege and incorporate by reference the common allegations of this Complaint as though fully set forth herein.

82.     Defendant City of Fort Myers owed a duty to Plaintiffs and Members of the Exposure to Arsenic Contaminated Sludge Class and Property Damages Class to exercise due and reasonable care in its disposal of arsenic sludge and to prevent or minimize any discharge or release of arsenic into the surrounding environment, including into the air, soils, surface water and groundwater.

18

83.     Defendant knew or reasonably should have known that the discharge or release of arsenic sludge into the environment required adequate safety precautions to ensure that arsenic was not released into the surrounding environment.

84.     Defendant knew or reasonably should have known that the discharge or release of arsenic sludge into the environment was potentially hazardous to human health and the environment.

85.     Defendant breached the foregoing duties owed to Plaintiffs and Members of the Exposure to Arsenic Contaminated Sludge Class and Property Damages Class by failing to exercise due care in its disposal of arsenic sludge into the environment in a manner that resulted in the contamination of the air, soils, the local groundwater aquifer, and private properties.

86.     As a direct, proximate and foreseeable result of Defendant's breach, Plaintiffs Deretha Miller, Luetricia Freeman Becker, Ralph Henry and Noemy Rodriguez and Members of the Property Damages Class have suffered damages in the form of real property damage, out of pocket expense, loss of use and enjoyment of property, diminution in property value, annoyance, discomfort, and inconvenience, for which Defendant are liable in damages.

87.     As a direct, proximate and foreseeable result of the Defendant's breach, Plaintiffs Deretha Miller, Luetricia Freeman Becker, and Members of the Exposure to Arsenic Contaminated Sludge Class have suffered exposure to toxic arsenic such that they require long-term medical monitoring.

## COUNT 4: STRICT LIABILITY CLAIMS FOR DAMAGES PURSUANT TO
## FLA. STAT. § 376.313

88.     Plaintiffs repeat, re-allege and incorporate by reference the common allegations of this Complaint as though fully set forth herein.

89.     During the City's ownership and use of the Dunbar Site, some form of emissions, leakages, seeping, blowing, releases, transfers, dumping, emptying, pouring or otherwise prohibited discharges of pollutants, contaminants, hazardous substances, and/or pollution have occurred and continue to occur.

90.     The toxic and hazardous substances, contaminants, pollutants, and other materials that are being and were emitted, leaked, blown, transferred, seeped, released, dumped, emptied, poured or otherwise discharged from the Sludge Dump in Dunbar, are substances that are encompassed within the meanings and protections of Fla. Stat. § 376.313.

91.     Defendants violated the statute by permitting, causing, or otherwise allowing the hazardous substances, contaminants, chemicals, pollutants, and other materials to be emitted, leaked, blown, transferred, seeped, released, dumped, emptied, poured or otherwise discharged onto private property from the Dunbar Site.

92.     Defendants continue to violate the statute by permitting, causing, or otherwise allowing the hazardous substances, contaminants, chemicals, pollutants, and other matters to continue be emitted, leaked, blown, transferred, seeped, released, dumped, emptied, poured or otherwise discharged from the Dunbar Site onto private property.

93.     The soil and groundwater contamination caused by the City has not been abated on the Plaintiffs' properties and, as such, the applicable statute of limitations does not bar this action.

94.     The arsenic-laden sludge, arsenic in soils and arsenic in groundwater at the Dunbar Site continues to migrate and contaminate adjacent properties as arsenic continues to leach from the sludge into groundwater and soils and is causing or contributing to arsenic pollution both onsite and offsite of the Sludge Dump.

95.     The wrongful invasion of the rights of Plaintiffs and Members of the Property Damages Class has not ceased.

96.     Plaintiffs and Members of the Property Damages Class have suffered and will continue to suffer damages to their property as a result of the actions of the Defendants.

97.     Fla. Stat. § 376.313 was enacted for the protection of persons such as Plaintiffs and Members of the Property Damages Class.

98.     As a result of Defendants' actions, Plaintiffs and Members of the Property Damages Class have suffered damages in the form of real property damage, out of pocket expense, loss of use and enjoyment of property, diminution in property value, annoyance, discomfort, and inconvenience, for which Defendants are strictly liable in damages.

## COUNT 5: PRIVATE NUISANCE

99.     Plaintiffs repeat, re-allege and incorporate by reference the common allegations of this Complaint as though fully set forth herein.

100.    Defendants, through their acts and omissions relating to their disposal of arsenic contaminated sludge on the Dunbar Site, have unreasonably and substantially interfered with the property rights and use and enjoyment of the property of Plaintiffs and Members of the Property Damages Class so as to constitute a private nuisance.

101.    As a direct and proximate result of Defendants' creation and maintenance of a private nuisance, Plaintiffs and Members of the Property Damages Class have suffered damages in the form of real property damage, out of pocket expense, loss of use and enjoyment of property, diminution in property value, , annoyance, discomfort and inconvenience, for which Defendants are liable in damages.

## COUNT 6: NEGLIGENT FAILURE TO WARN

102.    Plaintiffs repeat, re-allege and incorporate by reference the common allegations of this Complaint as though fully set forth herein.

103.    The City's activities at Dunbar Site were operational level governmental actions and decisions.

104.    The City, with its knowledge and control over the Dunbar Site, failed to remediate contamination on the site, failed to remediate prior to allowing additional houses to be built near the site, and failed to clean up the site later when it received confirmation of sampling containing high levels of arsenic from its own consultant.

105.    The lime sludge the City dumped at the Dunbar Site has contaminated an underground drinking water source beyond the solid waste boundary, *i.e.*, the boundary of the City's Dunbar Site.

106.   The City knew that people in the area near the Sludge Dump were all drinking from well water until the 1980s and knew or should have known that there would be people near the Dunbar Site who may still use wells for water.

107.   The City negligently failed to remediate the properties, allowed flooding of contaminated ground and surface water from the properties, negligently allowed truckloads of lime sludge to be carried through the Plaintiffs' communities, and is negligently failing to clean or otherwise remediate the soil and groundwater.

108.   The City negligently allowed contaminated soil and debris to be discharged on the Plaintiffs' properties and persons, negligently failed to clean subsurface soil, negligently failed to clean groundwater, negligently failed to clean contaminated right of ways, and negligently failed to test all adjacent homes and properties.

109.   The City's above-referenced conduct created hazardous conditions, and at all times it knew or should have known that the Plaintiffs were in the immediate zone of a foreseeable risk of harm, to be physically exposed to hazardous substances and contaminants.

110.   The City, by creating these hazardous conditions, had a duty to warn the Plaintiffs of the conditions.

111.   The City had a duty to warn Plaintiffs that the soil and groundwater at the Dunbar Site was and continues to be contaminated.

112.   The City had a duty to remediate the surface and subsurface soil, groundwater and other contaminated matter at the Dunbar Site.

113.    The City had a duty to remediate or otherwise clean or make safe the surrounding properties contaminated by the hazardous substances and pollutants and debris discharged from the Sludge Dump in Dunbar.

114.    The City has a duty to exercise reasonable care in not releasing, discharging, depositing and/or transporting toxic chemicals, hazardous substances, contaminants or pollutants that it knew or should have known could result in property damages and personal injuries.

115.    The City has breached these duties by its negligent acts and omissions regarding all aspects of the Dunbar Site and failed to warn the Plaintiffs in every regard.

116.    The City breached its duty of care by failing to warn the Plaintiffs that their properties had harmful substances, contaminants and pollutants, and that they should seek medical care to determine the impact to their health.

117.    The City breached its duty of care by failing to warn Plaintiffs that well water used and consumed by Plaintiffs was and is contaminated and will have a detrimental effect on their health.

118.    The City breached its duty of care by failing to warn Plaintiffs, and others, not to come into contact with discharged groundwater or other surface water pumped from the Dunbar Site and surrounding properties or otherwise discharged in a manner similar to storm water runoff.

119.    The City breached its duty of care by failing to assure that no Plaintiffs consumed or otherwise had physical contact with contaminated ground water and soil.

120.    The City breached its duty of care by failing to lessen the risk of physical injuries and property damages of the Plaintiffs.

121.    The City breached its duty of care by failing to take sufficient precautions to protect the Plaintiffs from the harm created and continuing to be created from the Dunbar Site.

122.    The City breached its duty of care by failing to prevent or prohibit the discharge of hazardous substances, pollutants and contaminated materials at the Home-a-rama property on South Street.

123.    The City breached its duty of care by failing to warn residents of the dangers when it was testing the Dunbar Site.

124.    The City continues to breach its duty of care by resisting remediation of properties nearby the Dunbar Site.

125.    As a direct and proximate result of the City's breaches, the Plaintiffs and Members of the Exposure to Contaminated Sludge Class are still suffering from exposure to continuous contamination from underground water flows and storm water runoff.

126.    As a direct and proximate result of the City's breaches, Plaintiffs and Members of the Exposure to Contaminated Sludge Class have incurred substantial injuries and damages including but not limited to past, present, and continuing exposure to toxic and hazardous materials and substances.

127.    As a direct and proximate result of the City's failure to lessen the risk or take sufficient precautions to protect the Plaintiffs and Members of the Property Damages Class have suffered property damages.

128.   As a direct and proximate result of the City's continued wrongful acts and omissions, the Plaintiffs and Property Damages Class who are property owners in the area suffered injuries in the form of property damage in that their properties were contaminated, they lost use of their properties, and the fair market values were substantially depreciated or destroyed.

129.   As a direct and proximate result of the City's continued wrongful acts and omissions, Plaintiffs and Members of the Exposure to Arsenic Contaminated Sludge Class, were exposed to excessive levels of extremely hazardous toxic chemicals and substances. Plaintiffs and Members of the Exposure to Arsenic Contaminated Sludge Class seek a Court Order establishing a Court-supervised medical monitoring program which provides for medical testing, surveillance, monitoring and study of the Plaintiffs for conditions caused by exposure to the toxic substances, including but not limited to arsenic.

130.   As a direct and proximate result of these continued exposures to hazardous and toxic chemicals and substances, Plaintiffs and Members of the Property Damages Class seek to recover real property damage, out of pocket expense, loss of use and enjoyment of property, diminution in property value, annoyance, discomfort and inconvenience, for which Defendants are liable in damages.

## COUNT 7: MEDICAL MONITORING

131.   Plaintiffs repeat, re-allege and incorporate by reference the common allegations as though fully set forth herein.

132.   Plaintiffs and Members of the Exposure to Contaminated Sludge Class

assert an equitable claim for medical monitoring pursuant to *Petito v. A.H. Robins Co.*, 750 So.2d 103 (Fla. 3d D.C.A. 1999). Such relief is available notwithstanding the absence of manifestations of a present physical injury or symptomatic disease.

133.    Plaintiffs and Members of the Exposure to Contaminated Sludge Class have been exposed to greater than normal background levels of various toxic chemicals including, but not limited to, arsenic.

134.    The referenced toxin, arsenic, is a proven hazardous substance which can cause a wide range of personal injuries and medical maladies, including various latent diseases for which the City's acts and/or omissions seriously increased the risk of Plaintiffs and Members of the Exposure to Arsenic Class of developing serious maladies and diseases.

135.    Plaintiffs and Members of the Exposure to Contaminated Sludge Class have been and continue to be exposed to elevated and hazardous levels of toxic substances through continued contact with contaminated surface and subsurface soil, lime sludge, water fruits, vegetables or other flora grown in and around the contaminated soil, in addition to consumption of contaminated groundwater, fruits, and vegetables and/or other flora grown in the contaminated soil, ingestion or inhalation of toxic matter, and continued physical contact with contaminated soil, groundwater, vapors, and debris.

136.    The City's negligent acts and omissions, as set out in this Complaint and incorporated herein by reference, include but are not limited to: negligently dumping lime sludge on the Dunbar Site, failure to remediate the Sludge Dump, and failure to warn residents of the results of soil sampling taken from 2007 onward, or the dangers to health

from exposure to the contaminants located on the Dunbar Site.

137.   The City's continued negligent acts and omissions, as set out in this Complaint and incorporated herein by reference, are the proximate cause of higher than normal, in fact excessive exposure, to hazardous substances and contaminants, including arsenic.

138.   Monitoring procedures that make the early detection of the diseases correlated to the exposure of referenced hazardous substances and contaminants currently exist.

139.   The monitoring procedures or regimes are different from those procedures normally recommended that would be used in the absence of the exposure.

140.   The prescribed medical surveillance is reasonably and medically necessary according to contemporary scientific principles for persons, such as Plaintiffs and Members of the Exposure to Contaminated Sludge Class, who have been exposed and continue to be exposed to excessive levels of the referenced hazardous chemicals and materials in order to effectively treat Plaintiffs and Members of the Exposure to Contaminated Sludge Class and to protect the public interest.

141.   Plaintiffs and Members of the Exposure to Contaminated Sludge Class will suffer irreparable harm if the requested medical monitoring program is not implemented because they are in danger of suffering catastrophic latent diseases as a result of their prolonged exposure to toxic and hazardous substances resulting from the City's negligence.

142.   Detection of these diseases and early treatment is medically reasonable

and necessary to prevent progression and further injuries.

143.   It is also medically reasonable and necessary to collect data and coordinate study efforts for persons exposed to such substances in order to effectively treat Plaintiffs and Members of the Exposure to Contaminated Sludge Class. Without the requested medical monitoring programs, they will be subjected to further injuries and delayed treatment.

144.   As a direct and proximate result of these continued exposures to hazardous and toxic chemicals and substances, Plaintiffs and Members of the Exposure to Contaminated Sludge Class require a Court-supervised medical monitoring program which provides for medical testing, surveillance, monitoring and study of the Plaintiffs and Members of the Exposure to Contaminated Sludge Class for conditions caused by exposure to the toxic substances, including but not limited to arsenic.

## CLASS ACTION ALLEGATIONS

145.   Plaintiffs bring this Class action on behalf of the proposed Classes as set forth below:

Property Damages Class:

All natural persons, including any person claiming by, through or under a Class Member, who, as of the time of filing this complaint, have interests in residential real property within a five (5) block radius of the City's arsenic Sludge Dump.

Exposure to Arsenic Contaminated Sludge Class: All persons, whether minor or adult, including any person claiming by, through, or under a Class Member, who, as of the time a class is certified in this case, have resided or currently reside within a five (5) block radius of the City's arsenic Sludge Dump at any time after the arsenic sludge was dumped and have been exposed to the sludge and its constituents through drinking water, physical contact, ingestion of contaminated soil, or breathing contaminated dust.

146.   Excluded from the Classes are:

a.   The City, its Mayor and City Manager, and   the City's legal representatives, and its officers and City Council members;

b.   The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case;

c.   Any attorneys, or their immediate families, representing Plaintiffs or Members of the proposed Classes;

d.   All persons who otherwise would be included under one or more of the class descriptions but who have filed a lawsuit for manifest personal injury for illness related to exposure to the arsenic sludge;

e.   All persons who properly execute and timely file a request for exclusion from the Classes, if the opportunity is provided to opt out of the Classes.

147.   Plaintiffs reserve the right to modify and/or amend the definition of the Classes, if, prior to the Court's determination on whether certification is appropriate, discovery and further investigation reveals that either Class should be modified or amended in any way.

### Fed. R. Civ. P. 23(a) and 23(b)(3)

148.   Plaintiffs bring this action pursuant to the provisions of Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure as a Class action on their own behalf and on behalf of other persons similarly situated.   This action satisfies the numerosity, commonality, typicality, predominance, and superiority requirements of Fed. R. Civ. P. 23(a) and 23(b)(3).

**Numerosity**

149.    Although the exact number of Class Members is uncertain at this time and can be ascertained only through appropriate discovery, the Members of the Classes are so numerous that separate joinder of each member is impracticable.  Upon information and belief, the number of Class Members in each class is likely to be well over 100. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and the Court.

150.    Putative Class Members are readily identifiable through publicly available property records.

**Typicality**

151.    Plaintiffs' claims are typical of the claims to be advanced by Members of the Classes, and their claims encompass those of the other Class Members in each class, in that the facts and circumstances giving rise to liability are the same, the claims are based on the same legal theories, and the damages suffered by the Plaintiffs are the same kinds of damages suffered by the Members of the Classes.

**Adequate Representation**

152.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes, as their interests do not conflict, their interests are co-extensive with common rights of recovery based on the same essential facts and legal theories, they are members of the same communities, they are similarly damaged and are seeking the same remedies, and they intend to prosecute this action vigorously.

153.    Plaintiffs have retained counsel competent and experienced in complex Class action and toxic tort litigation, including actions like this one, representing putative Class Members whose properties have been contaminated and/or devalued by the acts and omissions of a polluter.  Plaintiffs' counsel intend to prosecute this action vigorously.

### Predominance of Common Questions

154.    With respect to issues and claims raised herein, questions of law and fact common to Class Members predominate over any questions affecting only individual members of the Classes.  The only individual question affecting individual Members of the Classes is the precise amount of damages to which each Class Member is entitled, and such damages may be reasonably and fully determined and calculated through the mechanism of a class action.  On the other hand, there are numerous questions of law or fact common to the Classes, including, but not limited to:

a.  The history of Defendants' dumping of arsenic sludge on the property in the Dunbar neighborhood;

b.  Whether Defendants owed a duty to Plaintiffs and Members of the Classes to prevent and/or minimize any discharge or release of arsenic sludge into the surrounding environment;

c.  Whether Defendants knew or reasonably should have known that the failure to have policies or procedures regarding the proper handling, cleanup, or disposal of arsenic sludge would result in contamination to groundwater and soils and cause damages to Plaintiffs and Members of the Classes;

d. Whether it was reasonably foreseeable to Defendants that the discharge or release of arsenic sludge into the environment would result in contamination of groundwater and soils and cause damages to Plaintiffs and Members of the Classes;

e. Whether the use, handling, discharge and/or disposal of arsenic sludge by Defendants haves created and continues to create a nuisance as to Plaintiffs and Members of the Classes by interfering with their use and enjoyment of their property;

f. Whether the Defendants owed a duty to warn the Plaintiffs and Members of Classes that the Dunbar Site soil and groundwater contained elevated levels of arsenic contamination and that they were likely to be exposed; and

g. Whether Defendants' contamination of the groundwater with toxic arsenic gives rise to a suit for damages, pursuant to Fla. Stat. § 376.313, resulting from a discharge or other condition of pollution covered by Fla. Stat. §§ 376.30-376.319.

**Superiority**

155. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy.

156. Absent a Class action, most Class Members would likely find the cost of litigating their claims to be prohibitively high and, therefore, would not have an effective

remedy at law.  Further, there is no interest by Class Members in individually controlling the prosecution of separate actions.

157.   Class treatment of common questions of law and fact will conserve the resources of the courts and litigants, and will promote consistency and efficiency of adjudication.  Whatever difficulties may exist in the management of a Class action will be greatly outweighed by its benefits.

### Fed. R. Civ. P. 23(a) and 23(b)(2) Injunctive or Declaratory Relief

158.   In addition to the above, Plaintiffs bring this Class action under Fed. R. Civ. P. 23(a) and 23(b)(2), because Defendant has acted or refused to act on grounds that apply generally to the Classes, such that final injunctive relief or declaratory relief is appropriate with respect to each Class as a whole.  Such injunctive relief includes, but is not limited to: (1) an injunction to require remediation of the arsenic sludge disposal site and contaminated soils; (2) an injunction to require remediation of the groundwater aquifer in the area near the arsenic dump; and (3) an Order requiring Defendant to fund a medical monitoring program sufficient to monitor the deleterious effects and potentially-deleterious effects of arsenic on the human body and to detect these effects to the extent possible.

### Fed. R. Civ. P. 23(a) and 23(c)(4) Certification of Particular Issues

159.   In the alternative to certification under Fed. R. Civ. P. 23(b)(2) or 23(b)(3), Plaintiffs and Members of the Classes seek to maintain a Class action with respect to particular issues under Fed. R. Civ. P. 23(a) and 23(c)(4).

160.    The liability of Defendant for the damages caused to Plaintiffs and Class Members in the Zone of Contamination, including liability for negligence, strict liability, private nuisance, failure to warn, and medical monitoring is suitable for issue certification under Fed. R. Civ. P. 23(c)(4).

## RELIEF DEMANDED

WHEREFORE, Plaintiffs and Members of the above proposed Classes respectfully request this Court to grant the following relief:

(a) That this case be certified as a Class action as proposed, pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(b) Enter a declaratory judgment that the City's arsenic Sludge Dump is an "open dump" and that Defendant has violated and is in violation of RCRA, 42 U.S.C. § 6945(a), for the operation of an open dump;

(c) Enter a declaratory judgment that the City's arsenic Sludge Dump may present an imminent and substantial endangerment to health or the environment, pursuant to RCRA, 42 U.S.C. § 6972(a)(1)(B);

(d) Enter an enforcement order under RCRA or an injunction ordering Defendant to remove the arsenic sludge and remediate the soil and groundwater contamination in the Dunbar neighborhood;

(e) Order Defendant to pay civil penalties of up to thirty-seven thousand five hundred dollars ($37,500) per day for each day of each violation of RCRA set out in this Complaint, pursuant to Sections 3008(g) and 7002(a) of RCRA; 42 U.S.C. §§ 6928(a) and 6972(a);

(f) Award Plaintiffs and Members of the Property Damages Class damages sufficient to compensate them for real property damage, loss of use and enjoyment of property, diminution in property value, and for annoyance, discomfort, and inconvenience;

(g) Issue an injunction requiring Defendant to fund a medical monitoring program which provides for medical testing, surveillance and study of the Plaintiff and Members of the Exposure to Arsenic Contaminated Sludge Class to be created and supervised by the Court, including a Court-appointed plan administrator and that the court reserve jurisdiction to enforce the terms and conditions of the plan;

(h) Award Plaintiff their costs, including reasonable attorney and expert witness fees, as authorized by Section 7002(e) of RCRA, 42 U.S.C. § 6972(e); and

(i) Award such other and further relief as this Court may deem just, proper, and equitable.

**A JURY IS DEMANDED TO HEAR THIS CASE.**

*/s/ Ralf Brookes*
Ralph Brookes
RALF BROOKES ATTORNEY
Florida Bar No. 0778362
1217 E Cape Coral Parkway #107
Cape Coral, Florida 33904
Telephone: (239) 910-5464
Facsimile: (866) 341-6086
Ralf@RalfBrookesAttorney.com
RalfBrookes@gmail.com

*Lead Attorney and Trial Counsel*

Gary A. Davis

N.C. Bar No. 25976 *(request for admission pro hac vice)*
Davis & Whitlock, P.C.
21 Battery Park Ave., Suite 206
Asheville, NC 28801
Telephone: (828) 622-0044
Facsimile: (828) 398-0435
gadavis@enviroattorney.com