UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

DERETHA MILLER, TAMBITHA
BLANKS and WILLIE BLANKS,
individually, and on behalf of a class of
persons similarly situated

        Plaintiffs,

v.                                 Case No.:  2:18-cv-195-FtM-38NPM

THE CITY OF FORT MYERS,
RANDALL P. HENDERSON, JR.
and SAEED KAZEMI,

        Defendants.

_____/

**OPINION AND ORDER**[1]

      Before the Court is Defendants City of Fort Myers, Randall Henderson, and Saeed Kazemi's (collectively "the City") Motion for Partial Summary Judgment on RCRA (Doc. 115) and Plaintiffs Deretha Miller, Tambitha Blanks, and Willie Blanks' (collectively "Miller") response in opposition (Doc. 124). Also here is the City's Motion for Partial Summary Judgment on Plaintiffs' Individual State-Law Claims (Doc. 116) along with Miller's opposition (Doc. 125). Relatedly, each party moved to exclude expert opinions (Docs. 102; 110; 111; 112) to which the other responded (Docs. 106; 122; 123). For

---

[1] Disclaimer:  Documents filed in CM/ECF may contain hyperlinks to other documents or websites.  These hyperlinks are provided only for users' convenience.  Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees.  By allowing hyperlinks to other websites, this Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their websites. Likewise, the Court has no agreements with any of these third parties or their websites. The Court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

these reasons, the Court grants summary judgment on the remaining federal claim (Doc. 115) and declines supplemental jurisdiction over the remaining state-law claims.

## BACKGROUND

Many years ago, the City dumped lime sludge in a vacant field it owned (the "Site"). (Docs. 115-23 at 4; 115-36 at 32). That sludge (a by-product of the City's water treatment) was contaminated with arsenic. (Doc. 124-5 at 4). In all, the City dumped around 25,000 cubic yards of sludge at the Site. (Doc. 124-5 at 4). Over time, the Dunbar neighborhood developed surrounding the Site. (Doc. 115-25 at 2). Yet the sludge remained in the ground for about fifty years. (Doc. 115-9 at 3).

Around 2007, the Florida Department of Environmental Protection (the "Department") took an interest in the Site. (Doc. 124-5 at 2). Eventually, the City installed monitoring wells and started testing groundwater. (Doc. 115-9 at 3). The Department oversaw the process and reviewed regular monitoring reports. (Doc. 115-9 at 3). This continued for years until Miller notified the City she intended to sue. (Doc. 100-1). Two months later, the City decided to remove the sludge. (Doc. 115-3).

When Miller sued in 2018, the sludge was still buried on the Site. (Doc. 115-9 at 3). Later that year, the City began excavating and removing it. (Doc. 115-9 at 3). The City removed nearly 30,000 tons of sludge and soil. (Doc. 115-9 at 3). And by summer of 2019, all the sludge was gone. (Doc. 115-9 at 4; Docs. 115-21; 115-22; 124-4). According to the Department, "soil sampling has demonstrated there is no remaining soil contamination above the Department's Soil Cleanup Target Levels [("SCTL")] near the surface of the [S]ite." (Docs. 115-21 at 2; 124-4 at 2). But groundwater monitoring continues, with the City sending the Department test results monthly. (Doc. 124-4).

Despite the cleanup, Miller contends an imminent and substantial endangerment remains. Mostly, Miller challenges the City's investigation and remediation of contamination in the area, saying both were insufficient to abate the threat of harm. So, says Miller, endangerment remains and the Court should compel the City to remediate further in Dunbar.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). And a material fact is in genuine dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the initial burden to show the lack of a material fact. Shiver v. Chertoff, 549 F.3d 1342, 1343 (11th Cir. 2008). At this stage, courts must view all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. Rojas v. Florida, 285 F.3d 1339, 1341-42 (11th Cir. 2002). But if "the movant adequately supports its motion, the burden shifts to the nonmoving party to show that specific facts exist that raise a genuine issue for trial." Stephens v. Mid-Continent Cas. Co., 749 F.3d 1318, 1321 (11th Cir. 2014) (citation omitted).

"As relevant here, when the summary judgment movant does not bear the burden of proof at trial, the movant may show 'that there is an absence of evidence to support the non-moving party's case.'" Doe v. Drummond Co., 782 F.3d 576, 603-04 (11th Cir. 2015) (quoting Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-16 (11th Cir. 1993)). A

"negation of the non-moving party's claim is not required." *Id.* at 604. "If the movant shows that there is an absence of evidence, the non-moving party who bears the burden of proof at trial must contradict this showing by demonstrating 'that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion.'" *Id.* (quoting *Fitzpatrick*, 2 F.3d at 1116).

## DISCUSSION

### A. *Daubert*[2] Motions

Before jumping into the merits, each side filed *Daubert* motions to exclude portions of the other's expert opinions. The Court addresses two of those motions: Miller's challenge to Dr. Christopher Teaf (Doc. 112) and the City's challenge to Isidro Duque (Doc. 102). Both are denied.

In federal court, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" when,

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Court is the "gatekeeper" to determine whether (1) the expert is qualified; (2) the methodology is reliable; and (3) the methodology is correctly applied to assist the factfinder. *E.g.*, *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005).

---

[2] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

*1. Teaf*

Miller moves to exclude several of Teaf's opinions from his declaration (Doc. 115-28) on three grounds. (Doc. 112).

To start, Miller argues Teaf offered opinions on geology and hydrogeology, but lacks the qualifications to do so. (Doc. 112 at 3-5). The City disagrees (Doc. 123), so does the Court. Much of Miller's quarrel appears to be with Teaf's lack of a degree in geology or hydrogeology. Yet "[e]xperts may be qualified by scientific training, education, or experience in the relevant field; they need not be formally educated to qualify as experts." *United States v. Williams*, 865 F.3d 1328, 1338 (11th Cir. 2017). In his declaration, Teaf explains his experience in toxicology and environmental risk assessment for over forty years. (Doc. 115-28 at 2-6). Part of that experience includes evaluating health and environmental impacts that various pollutants have "in water, soils, sediments, air, and other environmental media." (Doc. 115-28 at 3-4). According to the City, reviewing soil and groundwater conditions is an integral part of the exposure and risk assessments Teaf often performed as a toxicologist during the last four decades. (Doc. 115-28 at 3-6). What is more, Teaf recently published a paper using groundwater and soil data to determine the effects of arsenic. (Doc. 123 at 9). That is like the opinions offered here. Many of the challenged opinions are also supported by the City's geology expert, who is unchallenged. (Doc. 115-25). Miller offers nothing to rebut the evidence of Teaf's experience and qualifications to offer basic testimony on the migration of arsenic here. So to the extent that Miller seeks to exclude opinion on these matters, the Motion is denied.

Next, Miller contends Teaf's opinions on the effectiveness of the City's remediation should be excluded.  The City does not respond to that challenge.  Miller's point is well taken.  But typically, courts consider *Daubert* motions only as needed to resolve summary judgment.  *Lanard Toys Ltd. v. Toys "R" Us-Delaware, Inc.*, No. 3:15-cv-849-J-34PDB, 2019 WL 1304290, at *6 (M.D. Fla. Mar. 21, 2019); *Mama Jo's, Inc. v. Sparta Ins.*, No. 17-cv-23362-KMM, 2018 WL 3412974, at *4 n.9 (S.D. Fla. June 11, 2018).  As explained below, the success of the City's remedial efforts is not dispositive.  So while the Court will not rely on any opinion Teaf offers on the City's cleanup effectiveness, it need not decide whether to exclude the opinion on that basis.

And finally, Miller seeks to exclude Teaf's opinions on background levels of arsenic in the soil because he failed to show his methodology was reliable.  But as the City notes, Teaf did not opine on the actual background levels of arsenic in Lee County.  Rather, he discussed studies of background levels in Florida generally.  Miller does not challenge those studies, some of which included data from Lee County.  Teaf simply stated those sample sizes were too small to draw definitive conclusions about natural arsenic levels.  (Doc. 115-28 at 11-12).  In short, Teaf formed no opinion on the background levels in Lee County, except the fact there is likely some background level.  For that reason, there is no methodology to attack.

Thus, Miller's Motion (Doc. 112) is denied.

### 2. *Duque*

The City moves to exclude a portion of Duque's expert opinion.  (Doc. 102).  Specifically, the City challenges Duque's use of the toxicity characteristic leaching procedure ("TCLP") because he was not qualified to discuss it and, regardless, TCLP

does not apply to this case.  Miller counters that Duque did not offer an opinion on that test to determine if the sludge could leach to surrounding properties.  Instead, says Miller, he relied on off-Site arsenic exceedances to conclude the sludge was the source of groundwater contamination.  Because Duque and Miller clarified the opinion was not based on the TCLP, the Motion (Doc. 102) is denied.

## B.  RCRA Claim

Moving onto the merits, the City seeks summary judgment on Miller's last federal claim: imminent and substantial endangerment under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B).  (Doc. 115).  These are sometimes called "endangerment claims."  Preliminarily, it is necessary to reorient Miller's focus for this claim—again.

RCRA permits a citizen suit "against any person . . . who has contributed or who is contributing to the past or present . . . disposal of any solid or hazardous waste *which may present an imminent and substantial endangerment to health or the environment*."[3] 42 U.S.C. § 6972(a)(1)(B) (emphasis added).  "The operative word in the statute is the word 'may.'" *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1015 (11th Cir. 2004). This is "'expansive language' that confers 'upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate *any risk* posed by toxic wastes.'"  *Id.* (quoting *United States v. Price*, 688 F.2d 204, 213-14 (3d Cir. 1982)).  While broad, "there is a limit to how far the tentativeness of the word *may* can carry a plaintiff." *Crandall v. City & Cty. of Denver, Co.*, 594 F.3d 1231, 1238 (10th Cir. 2010).

---

[3] While an endangerment claim may lie for imminent and substantial threats to the environment, neither party makes argument on that point.  This analysis, therefore, focuses on endangerment to health.

Three other terms are important too.

First, "'endangerment' means a threatened or potential harm, and does not require proof of actual harm." *Parker*, 386 F.3d at 1015. By combining "probabilistic" words like may and endanger, Congress signified "a reasonable prospect of future harm is adequate to engage the gears of [an endangerment claim] so long as the threat is near-term and involves potentially serious harm." *Me. People's All. & Nat. Res. Def. Council v. Mallinckrodt, Inc.*, 471 F.3d 277, 296 (1st Cir. 2006).

Second, that endangerment must be "imminent" (i.e., "threatens to occur immediately"). *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 485 (1996) (alteration accepted and citation omitted). "[W]aste which 'may present' imminent harm quite clearly excludes waste that no longer presents such a danger." *Id.* at 485-86. So "the endangerment must be ongoing, but the conduct that created the endangerment need not be." *Cox v. City of Dallas, Tex.*, 256 F.3d 281, 299 (5th Cir. 2001) (quoting *Conn. Coastal Fishermen's Ass'n v. Remington Arms Co.*, 989 F.2d 1305, 1316 (2d Cir. 1993)). In short, "there must be a threat which is present *now*, although the impact of the threat may not be felt until later." *Meghrig*, 516 U.S. at 486 (citation omitted).

And third, the imminent endangerment must be "substantial"; in other words, it must be "serious." *Parker*, 386 F.3d at 1015 (citation omitted). Courts seldom quantify the necessary level of harm with any precision. *E.g.*, *Simsbury-Avon Pres. Soc'y, LLC v. Metacon Gun Club, Inc.*, 575 F.3d 199, 211 (2d Cir. 2009). Instead, substantiality looks to formulations like whether "there is reasonable cause for concern that someone or something may be exposed to risk of harm by release, or threatened release, of hazardous substances in the event remedial action is not taken." *Burlington N. & Santa*

Fe Ry. v. Grant, 505 F.3d 1013, 1021 (10th Cir. 2007). The risk of harm cannot be "remote in time, completely speculative in nature, or de minimis in degree." Little Hocking Water Ass'n v. E.I. Du Pont de Nemours & Co., 91 F. Supp. 3d 940, 967 (S.D. Ohio 2015) (citation omitted); see also Tri-Realty Co. v. Ursinus Coll., 124 F. Supp. 3d 418, 442 (E.D. Pa. 2015).

Miller argues an imminent and substantial endangerment existed when she sued nearly two years ago—before the sludge removal—so the Court should focus on the state of the Site at that time. Yet the Court already told Miller it will not do so. (Doc. 86 at 4-5 ("The statute, Supreme Court, and Eleventh Circuit all mandate an analysis focused on present endangerment. . . . Consistent with the Order, the allegations of imminent and substantial endangerment today, rather than at some point in the past, are determinative here.")). To be sure, Miller cites several district court cases with language supporting her position. None are controlling. Nor are any convincing considering the statute and federal appellate courts' interpretations of that language. See, e.g., Meghrig, 516 U.S. at 483 ("RCRA's primary purpose, rather, is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'" (quoting 42 U.S.C. § 6902(b))). So while Miller need not show actual harm today, see Parker, 386 F.3d at 1015, she must show there is "a threat which is present now" or in the foreseeable future. See Meghrig, 516 U.S. at 486 (citation omitted); Parker, 386 F.3d at 1015.

Unsurprisingly, the City agrees, relying on a Tenth Circuit case (Crandall). And the Court considers that case instructive.

In *Crandall*, an airport used deicing fluid to clean planes at its terminal gates. 594 F.3d at 1233-34. This caused an imminent and substantial endangerment to travelers and airport employees, who breathed the toxic fumes. *Id.* Plaintiffs brought an endangerment suit to enjoin the practice. *Id.* at 1232, 1235. During the litigation, the airport stopped deicing the planes at its gates, remediated the building, and started testing the air quality. *Id.* at 1234-35. By the time of a bench trial several years later, there was no evidence of an imminent or substantial endangerment after the remediation. *Id.* So the district court entered judgment for the airport. *Id.* The Tenth Circuit affirmed—reasoning there was no imminent or substantial endangerment because the airport eliminated the risk of any current or future harm. *Id.* at 1238-39 (stating "[n]othing going on at the airport at the time of trial, or expected in the immediate future, would, even without remedial measures, present a prospect of harm to human health"). As the Tenth Circuit stated, "the focus should [be] on the risk that harm would occur in the future, not on whether harm had occurred or was imminent" in the past. *Id.* at 1237.

Miller ignores *Crandall*. That is rarely the best way to address an on-point circuit court case. It is especially unhelpful when another circuit court recently reached a similar conclusion. *Liebhart v. SPX Corp.*, 917 F.3d 952 (7th Cir. 2019). While reversing the district court for applying a heightened endangerment standard, the Seventh Circuit emphasized it is harm present now or in the future that governs. *Id.* at 957-61. The court concluded plaintiffs "must show that there are [contaminants] currently on the property that have the potential to substantially threaten their health at some point in the future if they continue to occupy the premises and prolong their exposure." *Id.* at 961.

Thus, the Court again concludes the endangerment analysis will focus on the current and future state of the Site and surrounding area, not as the neighborhood existed at some point in the past. All the same, the conditions of the Site at the time of filing suit are relevant to some degree. *E.g.*, *Schmucker v. Johnson Controls, Inc.*, No. 3:14-CV-1593 JD, 2019 WL 718553, at *24 (N.D. Ind. Feb. 19, 2019). Those past conditions, however, are just not controlling in the face of later evidence. *See Simsbury-Avon*, 575 F.3d at 211-15 (holding there must be enough "evidence for a jury to find that the alleged contamination presents a reasonable prospect of future harm"). For example, the on-Site soil samples exceeding the SCTL in 2017 (Doc. 124-10 at 7-8) have no bearing here because those conditions no longer exist on the Site; the City already trucked that soil a few counties away. (Doc. 115-9 at 3; 115-21).

While the City removed the sludge, it is still monitoring the area (with Department oversight) to ensure there is no remaining contamination attributable to the Site. (Doc. 124-4). Miller is correct this remediation does not automatically bar an endangerment claim. *E.g.*, *Little Hocking*, 91 F. Supp. 3d at 968. So the Court cannot conclude there is no endangerment simply because the sludge is gone. Rather, the analysis must look at whether the Site may present an imminent and substantial endangerment even after the sludge removal.

Before addressing that, however, the parties dispute whether arsenic ever leached from the Site to surrounding properties through the groundwater. This would be significant because if contaminants could not spread from the Site, no risk from the Site ever existed. The evidence linking nearby contamination to the Site is tenuous. Using the synthetic precipitation leaching procedure ("SPLP")—as the Department

recommends—the City's experts determined no arsenic leached from the Site in levels above the MCL drinking water standard.[4] (Docs. 115-23 at 4, 6-9; 115-28 at 24-25); *see also* (Doc. 115-25 at 3-7). As mentioned above, Duque did not rely on the SPLP or TCLP. Instead, Duque relied on arsenic exceedances in off-Site monitoring wells to conclude the Site is the source of arsenic. (Docs. 124 at 17-18; 124-7 at 5-6). Yet it is clear other sources of arsenic may be causing some contamination.

For instance, the monitoring well exceedances are from the block north of the Site. But someone used that block as a fill pit to dump unknown materials in the 1970s and 80s. (Docs. 115-25 at 2-3; 124-7 at 10). When testing that soil, the boring samples contained limestone and construction debris that usually contain arsenic. (Docs. 115-26 at 5-6; 115-28 at 21-22; 115-36 at 28-29). Further, less than a mile from the Site, the City dumped nearly 500,000 square feet of sludge on its wellfield.[5] (Docs. 124-7 at 10; 125-22 at 2). And none of that includes the arsenic occurring naturally in Florida soils. (Docs. 124-10 at 4-5; 124-14 at 140-41). While neither party determined the actual background levels of natural arsenic near the Site, there seems little doubt there is some background level. (Doc. 124-10 at 4-5).

All the same, Duque generally opines the Site is the source of arsenic contamination in the area. (Doc. 124-7). And it is not the Court's place to weigh his credibility at summary judgment. *E.g.*, *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013). Given the lack of definitive evidence on other sources of arsenic

---

[4] The "MCL" is the drinking water maximum contaminant level set by the United States Environmental Protection Agency ("EPA"). (Doc. 115-23 at 4).

[5] Any contamination related to this dumping is not at issue.

and Duque's opinion (supported by monitoring well data), there is at least some genuine dispute of material fact as to whether arsenic leached from the Site through groundwater.

Assuming the arsenic leached from the Site to nearby properties, the Court must still decide whether the Site may present an imminent and substantial endangerment. "Though contamination need not currently be causing harm to support an endangerment claim, it threatens no endangerment if there is no likelihood of exposure." *Schmucker*, 2019 WL 718553, at *27 (collecting cases). So there generally must be some manner or pathway for exposure to support this claim. *E.g.*, *Atl. Holdings Ltd. v. Apollo Metals, Ltd.*, No. 16-6247, 2019 WL 1574313, at *12 (E.D. Pa. Apr. 10, 2019) ("To survive summary judgment, Plaintiff must present non-speculative evidence of a potential exposure pathway that may present and imminent and substantial endangerment."); *see also* (Doc. 115-37 at 14). Both sides agree there were four potential pathways to exposure here: groundwater, soil, dust, and skin exposure. And the primary danger from arsenic comes after ingesting or inhaling it. (Docs. 115-30 at 3; 115-37 at 13-14, 17). Following sludge removal, Miller's experts say groundwater and soil remain the most significant pathways. (Docs. 124-8 at 4; 124-11 at 3). Still, the Court addresses all four in turn.

*1. Groundwater*

In part, the City argues no imminent and substantial endangerment exists because there is no evidence of a potential for exposure to contaminated groundwater. Miller disagrees, contending one house uses well water and the City failed to adequately investigate well-water use in the area. Much of the evidence relates to the threat of groundwater. But first, below is some relevant law to consider.

The "mere presence" of contamination "is alone not enough to constitute an imminent and substantial endangerment." *E.g.*, *Mallinckrodt*, 471 F.3d at 282 (citation omitted); *see also Black Warrior River-Keeper, Inc. v. Drummond Co.*, 387 F. Supp. 3d 1271, 1305 (N.D. Ala. 2019); *City of Evanston v. N. Ill. Gas Co.*, 381 F. Supp. 3d 941, 963-64 (N.D. Ill. 2019) (holding that the "mere presence of chemicals, even above background levels," did not establish endangerment "without evidence of an exposure pathway"). This is true even for groundwater—the simple existence of contaminated groundwater does not automatically impel an endangerment claim. *E.g.*, *Schmucker*, 2019 WL 718553, at *26 & n.25 (collecting cases); *see also Warren v. Matthey*, No. 15-01919, 2016 WL 215232, at *7 (E.D. Pa. Jan. 19, 2016). Instead, many courts rejected groundwater endangerment claims with no evidence of anyone potentially drinking contaminated water. *E.g.*, *Warren*, 2016 WL 215232, at *7 ("A number of courts have found that a contaminated water supply does not pose an imminent and substantial endangerment where plaintiffs are not drinking the contaminated water."); *Scotchtown Holdings LLC v. Town of Goshen*, No. 08-CV-4720 (CS), 2009 WL 27445, at *2 (S.D.N.Y. Jan. 5, 2009).[6]

Here, there is no evidence groundwater may present an imminent and substantial endangerment because there is no pathway to exposure. Miller claims there are factual issues on whether residents are at imminent risk of drinking contaminated water. Yet

---

[6] *See also Leister v. Black & Decker (U.S.) Inc.*, 117 F.3d 1414, *3 (4th Cir. 1997) (unpublished table decision); *Birch Corp. v. Nev. Inv. Holding, Inc.*, 152 F.3d 924, *2-3 (9th Cir. 1998) (unpublished decision); *Two Rivers Terminal, L.P. v. Chevron USA, Inc.*, 96 F. Supp. 2d 432, 446 (M.D. Pa. 2000); *Sullins v. Exxon/Mobil Corp.*, No. 08-04927 CW, 2011 WL 8077086, at *5-7 (N.D. Cal. Jan. 26, 2011); *Foster v. United States*, 922 F. Supp. 642, 662 (D.D.C. 1996).

Miller does not point to any evidence supporting a reasonable inference for that chance. This leaves the Court with nothing but pure speculation people may be exposed to contaminated groundwater in a way that threatens their health.

Discovery only identified one well in the area that still may be used for drinking water.[7] (Doc. 124-7 at 5; 124-14 at 83-87; 124-16 at 6). That well, however, is upgradient from the Site. (Doc. 124-16 at 6, 48). Specifically, the well is two blocks southeast of the Site. Yet all the evidence here shows the groundwater flowing north through the Site, typically in a north to northwest direction. (Docs. 115-23 at 6; 115-25 at 1-2, 9; 115-36 at 25-26; 124-28 at 1). And most important, Miller tested that well—finding it does not have arsenic. (Doc. 115-36 at 16-17, 23). Relatedly, none of the named Plaintiff's use wells for drinking water. (Docs. 115-40 at 11; 115-41 at 13-14; 115-42 at 10). Nor has either party identified any other drinking wells.[8] (Docs. 115-36 at 16-17; 115-37 at 22).

Ignoring that evidence, Miller points to one house south of the Site with a sewer connection, but not a water line. (Doc. 124-17 at 1-2). So, says Miller, "they were still drinking well water" at the time of suit. (Doc. 124 at 6). There is no evidence anyone is actually using well water at that address (3324 Jeffcott Street). (Doc. 124-15 at 125-26; 124-17). Yet even if assumed to be true, this fact alone does not support an imminent and substantial endangerment for two reasons. First, this property is south of the Site (i.e., upgradient from it). So groundwater flows through the Site in the opposite direction.

_____

[7] While somewhat unclear from the record, it appears this well may not be used for drinking water anymore. (Doc. 115-28 at 17-18). For the sake of argument, the Court assumes this is a drinking well.

[8] In his deposition, Duque suggested there may be another drinking well. (Doc. 124-14 at 61-62, 86-87). Neither party addresses this. In any event, Duque stated no tested drinking well (whether it was one or two) contained arsenic. (Doc. 124-14 at 86-87).

(Doc. 115-25 at 1-2). And second, outside pure speculation, there is no evidence of any contamination at that property. While the Court must draw all reasonable inferences for Miller, inferences based on speculation and conjecture are not allowed. *E.g.*, *Hinson v. Bias*, 927 F.3d 1103, 1115 (11th Cir. 2019). No identified properties, therefore, support Miller's endangerment claim. *E.g.*, *Warren*, 2016 WL 215232, at *7.

Next, Miller argues the lack of evidence is because the City failed to investigate. Specifically, she says the City never tested several other wells as residents requested. Yet there is no evidence those wells were not tested. Miller mischaracterizes the deposition of the City Manager as stating the City never tested those wells. That is not what he said. Rather, the City Manager stated he did not know whether the tests occurred. (Doc. 124-15 at 302-03 ("I don't have the data what the [C]ity done based on those . . . I don't know what the status is on those [well tests]. . . . I don't have a knowledge of what happened to that five wells.")). In any event, from Duque's report and deposition, it appears those wells were irrigation, not drinking, wells. (Doc. 124-7 at 5 ("At least one well is still used for drinking water, and others are used for irrigation.")). While the Department's groundwater cleanup target level ("GCTL") for drinking water is 0.010 mg/l or 10 ug/l, the standard for irrigation groundwater is much higher (0.063 mg/l or 63 ug/l).[9] (Doc. 115-28 at 16). And there has never been a groundwater arsenic reading that high anywhere in the neighborhood.[10] (Doc. 115-28 at 16). Because the record does not

---

[9] Miller uses GCTL and MCL interchangeably. For arsenic in drinking water, the GCTL and MCL are the same (0.010 mg/l). (Docs. 115-23 at 4; 124-10 at 7-8).
[10] Both parties focus on drinking water. To the extent Duque suggested an exposure pathway exists for irrigation, Miller offers nothing to show endangerment on that basis. (Doc. 115-36 at 15, 17).

suggest anyone drinks from those wells and there is no other evidence of an imminent endangerment, this argument does not support the endangerment claim either.

Finally, Miller points to two monitoring wells north of the Site, just across the street. Neither well shows an imminent and substantial endangerment. While these wells are downgradient and one often exceeds the GCTL (Doc. 115-25 at 5-9), both are for monitoring so nobody drinks from them.[11] For that reason, the Department noted in one letter that measured groundwater exceedances "do not pose any immediate health risk, as this area is served by a public water supply." (Doc. 124-28 at 1). They also are on a right of way, not private property. (Doc. 115-28 at 18-19). And other groundwater tests Duque conducted on four properties just behind the wells were all below the GCTL for arsenic. (Docs. 115-25 at 7; 115-28 at 18; 124-14 at 64-67, 116-17). Three of those four test were below a detectable limit for arsenic. (Doc. 115-28 at 18). Additionally, the simple reliance on exceedances in those monitoring wells is imprudent considering other monitoring wells upgradient of the Site (numbers seven and nine) sometimes exceed the GCTL too. (Docs. 115-25 at 6-7; 124-7 at 6; 124-35 at 13, 17-18). Per se reliance on a monitoring well exceedance is particularly illogical considering the monitoring well right next to the largest sludge pit on the Site (number six) has *never* exceeded the GCTL for arsenic. (Docs. 115-25 at 6-7; 124-3 at 18-19, 43; 124-35 at 5, 8, 12). In short, exceedances at the two monitoring wells do not show an imminent and substantial endangerment.

---

[11] While the City's expert opined one of these monitoring wells (number eight) is really upgradient from the Site (Doc. 115-25 at 7), the Court will assume it is downgradient because of Duque's opinion (Doc. 124-7 at 5).

At trial, it is Miller's burden to prove the endangerment claim. *See Parker*, 386 F.3d at 1014-15. Because the City showed nothing supports this claim for groundwater, Miller must come forward with evidence. This is summary judgment—time to put the "evidentiary cards on the table." *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017). Yet all that Miller has done is speculate that perhaps someone is drinking contaminated well water and argued the City should have investigated more. That is not enough to survive summary judgment for this endangerment claim. *E.g.*, *Warren*, 2016 WL 215232, at *7; *see also Hinson*, 927 F.3d at 1115-16 ("It is not enough for the nonmoving party to 'merely assert that the jury might, and legally could, disbelieve' the moving party's evidence. Instead, the nonmoving party must present 'affirmative evidence' that would allow a reasonable jury to rule for him." (alteration accepted and internal citation omitted) (quoting *Liberty Lobby*, 477 U.S. at 256-57)).

*2. Soil*

Next, the City asserts soil contamination does not present an imminent and substantial endangerment. Miller disagrees, contending there is an endangerment because soil tests in the area near the Site had arsenic results exceeding the SCTL.

Again, the existence of some level of contamination does not automatically signify an imminent and substantial endangerment. *E.g.*, *Mallinckrodt*, 471 F.3d at 282. It is equally well established "state standards do not define a party's federal liability under RCRA." *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 261 n.6 (3d Cir. 2005). So showing contamination levels at or over state cleanup standards—on its own—is insufficient to support an endangerment claim. *See, e.g., id.*; *Simsbury-Avon*, 575 F.3d at 212-14; *City of W. Sacramento, Cal. v. R&L Bus. Mgmt.*, No. 2:18-cv-00900 WBS EFB,

2019 WL 6528957, at *5 (E.D. Cal. Dec. 4, 2019); *City of Fresno v. United States*, 709 F. Supp. 2d 888, 924-30 (E.D. Cal. 2010).

Here, there is no genuine dispute of material fact on an imminent and substantial endangerment through soil. For support, Miller's toxicology expert (Dr. Theron Blickenstaff) mainly relies on samples exceeding the Department's SCTL. (Doc. 115-37 at 22). The SCTL for arsenic in soil is 2.1 mg/kg. (Doc. 124-10 at 7). But state standards do not define RCRA liability. *E.g.*, *Interfaith*, 399 F.3d at 261 n.6. Moreover, much of Blickenstaff's concern hinged on sludge at the Site along with residents still using it. (Docs. 124-10 at 6; 115-37 at 23). That said, it is undisputed the sludge is gone and at least the top two feet of the Site's soil lacks arsenic. (Doc. 115-21). Finally, none of the samples Miller relies on even show a proper test exceeding the SCTL.

In March 2019, Duque tested soil samples from the named Plaintiffs' properties near the Site. (Doc. 124-7 at 9-10). One test (directly south of the Site) showed no detectable arsenic. (Doc. 124-7 at 9). Another (in the block east of the Site) had an arsenic reading of 0.51 mg/kg, well below the SCTL. (Doc. 124-7 at 9). And the other test (on Miller's property a block east of the Site) measured arsenic of 2.1 mg/kg, even with the SCTL. (Docs. 115-25 at 22; 124-7 at 9). No tests, therefore, exceed the SCTL. While one matches it, that alone does not demonstrate an imminent and substantial endangerment caused by the Site. A careful review of the record reveals Blickenstaff only opined levels *exceeding* the SCTL pose an imminent and substantial endangerment. (Doc. 124-10 at 7-8). Endangerment must be "substantial," meaning "serious." *Parker*, 386 F.3d at 1015. And without more, the fact there is arsenic in the soil does not automatically show a substantial endangerment. *See, e.g.*, *Simsbury-Avon*, 575 F.3d at

212-14.  Blickenstaff's own testimony bears this out; he noted people are regularly exposed to arsenic through their food and water. (Doc. 115-37 at 14).  So the argument falls flat that a single test, which does not exceed a nonbinding state standard, shows a substantial endangerment to health.

Even if the Court considered this one test to be a potential endangerment, there are several problems with the Miller's position.  First, Miller's property is upgradient from the Site.  (Docs. 115 at 6; 115-25 at 2; 124 at 6).  Miller points a blanket statement in Duque's report that soil contamination near the Site is due to the sludge.  (Doc. 124-7 at 10).  But the record does not support that statement as it relates to Miller's property.  Duque conceded there is no evidence to show the flow of groundwater moving in that direction.  (Doc. 124-14 at 97-99).  In fact, Duque testified he did not consider groundwater flow in selecting that location to test.  (Doc. 124-14 at 121-24).  Rather, "There was no real rationale for the locations other than they were the ones that [he] could sample outside the property."  (Doc. 124-14 at 122).  Duque clarified that he wanted to determine whether properties near the Site had arsenic contamination.  (Doc. 124-14 at 122).  Yet Duque never opined on any connection between the Site and Miller's property.  Likewise, Miller offers nothing else to show how arsenic contamination traveled upgradient to her property through groundwater.  Moreover, Duque testified property in the area was apparently used for agricultural and filling purposes.  (Doc. 124-14 at 122-23).  That muddies any causal link between the Site and this particular property.  And to the extent that Miller argues arsenic-contaminated dust migrated from the Site to her property, no evidence supports that conclusion.  To the contrary, Miller could not recall dust ever

reaching her property. (Doc. 115-40 at 15-16). In sum, nothing connects the arsenic in that sample to the Site.

Next, Miller relies on Duque's soil testing in May 2019 from the block directly north of the Site. (Doc. 124-7 at 9-10). Two samples were below the SCTL, and two samples were above it. (Doc. 124-7 at 9-10). However, as the City notes, those samples were taken at depths of three and a half to four feet. (Doc. 101-5 at 31-32). But the SCTL only applies to soil between zero and two feet. (Docs. 115-25 at 7-8; 115-28 at 21-22). So Miller cannot simply rely on exceedances of a state standard when those standards were not applied correctly. Moreover, those samples contained debris (like limestone, concrete, and glass) that contain arsenic, potentially skewing the results. (Docs. 115-28 at 21-22; 115-36 at 28). Finally, Miller has shown no real chance residents might encounter soil four feet underground. *See, e.g.*, *Evanston*, 381 F. Supp. 3d at 963-64. Like the Department noted in one of its letters to the City, "two feet of clean soil serves as an engineering control that ensures that no one will come in contact with any remaining soil contamination in the subsurface." (Doc. 124-4 at 2).

Because she cannot show soil contamination linked to the Site, Miller cannot carry her burden at trial for an imminent and substantial endangerment on that basis. So summary judgment for the City is proper.

*3. Dust*

Moving onto the next pathway, the City contends there is no risk of endangerment from dust. Miller disagrees but offers nothing to support the position that arsenic-contaminated dust may present an imminent and substantial endangerment.

Miller argues dust migrated off the Site before and during sludge removal. (Doc. 124 at 20). But no record evidence supports the notion that arsenic-contaminated dust ever spread from the Site to the surrounding area. The best Miller can muster is Duque's unexplained statement that nearby soil contamination "could have resulted from the migration of dust from the Site through the years." (Doc. 124-8 at 4). Yet the only evidence of dust at all was during excavation of the Site to remove the sludge. And any dust abated when the removal finished. (Docs. 115-40 at 15-16; 115-41 at 14; 115-42 at 13-14, 17-20). The City offers test results of dust during sludge removal. (Docs. 115-28 at 22; 115-30 at 4-5). Those tests reveal levels of arsenic below acceptable levels. (Docs. 115-28 at 22; 115-30 at 4-5). While Miller argues this testing was not comprehensive enough to conclude dust was not a pathway to exposure, she offers no evidence dust was or remains an endangerment. So the City's test results are unrebutted. Regardless, if arsenic-contaminated dust escaped the Site at some point in the past, previous dispersal does not support dust remaining a pathway for exposure after removal.

Thus, the City demonstrated dust no longer presents an imminent and substantial endangerment.

### 4. Skin Exposure

Finally, the parties do not argue about skin exposure independent of the soil pathway addressed above. But Miller's expert opined skin exposure would occur through children playing or adults working on the Site. (Doc. 124-10 at 6-7). There is no longer sludge on the Site. Because that was the only identified means of exposure for this pathway, there is no imminent and substantial endangerment on this basis.

*5. Remedy*

Even if the Court concluded the Site may present and imminent and substantial endangerment, it is unclear what remedy the Court could craft. Ongoing remediation is not dispositive, but the Court may consider it. *E.g.*, *OSI, Inc. v. United States*, 510 F. Supp. 2d 531, 540-41 (M.D. Ala. 2007); *Tilot Oil, LLC v. BP Prods. N. Am., Inc.*, 907 F. Supp. 2d 955, 964-68 (E.D. Wis. 2012); *Christie-Spencer Corp. v. Hausman Realty Co.*, 118 F. Supp. 2d 408, 420 (S.D.N.Y. 2000). Although the Court will not consider its effectiveness, the remediation's undisputed facts militate against any remedy. The Department—which is far better positioned to oversee remediation—has been monitoring the Site for over ten years. It has been directing the cleanup for over a year. And the Site has been cleared of sludge to the Department's satisfaction. (Docs. 115-21; 115-22; 124-4). Going forward, the Department is monitoring monthly tests to ensure there are no lingering contamination effects from the now-removed sludge. (Doc. 124-4). None of this is dispositive, and perhaps the Court could order more remediation than the Department sees fit. But this situation undercuts Miller's position the Court needs to step in at this point. Given the sludge removal, lack of evidence for any imminent and substantial endangerment, and Department oversight, the Court determines no relief is necessary on the endangerment claim. *See Tilot Oil*, 907 F. Supp. 2d at 964-68; *Little Hocking*, 91 F. Supp. 3d at 967-68.

*6. Conclusion*

In sum, there is no genuine dispute of material fact over the endangerment claim. And the City is entitled to judgment as a matter of law because—on this record—no

reasonable jury could conclude the Site may present an imminent or substantial endangerment after sludge removal.

## C. State-Law Claims

The City also moves for summary judgment on Miller's state-law claims. (Doc. 116). Miller opposes. (Doc. 125). Yet there are no remaining federal claims, and federal question is the only jurisdictional basis. Neither party addresses whether the Court should continue to exercise supplemental jurisdiction. But the issue may be raised sua sponte. *E.g.*, *Dalton v. Physicians Stat Lab, Inc.*, No. 6:17-cv-2125-Orl-22KRS, 2019 WL 1093438, at *1 (M.D. Fla. Feb. 6, 2019); *Doe v. City of Miami Gardens*, 389 F. Supp. 3d 1118, 1134 (S.D. Fla. 2019).

Federal courts may decline supplemental jurisdiction after dismissing "all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Generally, a reexamination of supplemental jurisdictional is proper after dismissing all federal claims before trial. *Raney v. Allstate Ins.*, 370 F.3d 1086, 1088-89 (11th Cir. 2004). This is no less true because last federal claim was disposed of through summary judgment. *V.D.C. v. Dep't of Children and Families*, No. 8:17-CV-1697-T-27JSS, 2019 WL 462809, at *3 (M.D. Fla. Feb. 6, 2019) ("Because summary judgment will be granted on Plaintiffs' only federal claim, and the remaining claims arise under state law, the Court declines to exercise supplemental jurisdiction over these claims."); *see, e.g.*, *Murphy v. Fla. Keys Elec. Coop. Ass'n*, 329 F.3d 1311, 1320 (11th Cir. 2003); *Estate of Owens v. GEO Grp., Inc.*, 660 F. App'x 763, 774-77 (11th Cir. 2016).

"State courts, not federal courts, should be the final arbiters of state law." *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997). For that reason,

district courts are "strongly encourage[d]" to decline supplemental jurisdiction when all federal claims are dismissed before trial. *E.g.*, *Mergens v. Dreyfoos*, 166 F.3d 1114, 1119 (11th Cir. 1999) (citation omitted). In deciding whether to do so, courts consider these factors: "judicial economy, convenience, fairness, and comity."[12] *Baggett*, 117 F.3d at 1353.

First, judicial economy weighs against exercising supplemental jurisdiction. Judicial economy typically is "served when issues of state law are resolved by state courts." *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1288 (11th Cir. 2002). And litigating this state class action lawsuit in federal court does not promote judicial economy.

Second, convenience points to retaining jurisdiction. The Eleventh Circuit has noted, "as far as the parties are concerned, it would be most convenient to try every claim in a single forum." *Ameritox, Ltd. v. Millennium Laboratories, Inc.*, 803 F.3d 518, 539 (11th Cir. 2015).

Third, fairness considerations do not favor jurisdiction here. Each "litigant who brings supplemental claims in [federal] court knowingly risks the dismissal of those claims." *Id.* Moreover, Miller can still pursue her claims in state court without the need to conduct much—if any—discovery there. *Id.* ("Both parties are free to use evidence obtained during discovery to pursue their state-law claims in a proper forum."). Given these facts, "fairness concerns do not weigh in favor of retaining jurisdiction." *See id.* at 540.

---

[12] The Eleventh Circuit recently stated there is no need to consider these *Gibbs* factors when discharging under 28 U.S.C. § 1367(c)(3). *Sutherland v. Global Equip. Co.*, 2019 WL 4896969, at *3-4 (11th Cir. Oct. 4, 2019). But the Court will analyze the factors nevertheless in an abundance of caution.

And fourth, comity cuts against exercising supplemental jurisdiction. "It is a bedrock principle that 'needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.'" *Id.* (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)). This case raises important state-law questions of the duties Florida municipalities owe to their citizens in environmental torts spanning decades, along with issues of state-law sovereign immunity. It follows that comity is well-served by allowing Florida courts to resolve those matters instead of a federal court.

Relatedly, declining supplemental jurisdiction will not affect the statute of limitations on the state-law claims. Federal law tolled the running of the statute of limitations during this action. 28 U.S.C. § 1367(d); *see also Jinks v. Richland Cty. S.C.*, 538 U.S. 456, 463-64 (2003) (observing "state-law claims asserted under § 1367(a) will not become time barred while pending in federal court"). Thus, none of the claims will become time barred because of this discharge.

After weighing the above, the Court declines to exercise supplemental jurisdiction. So the state-law claims are dismissed without prejudice. Because the Court did not reach the state-law claims, the Motion for Partial Summary Judgment (Doc. 116), Motion for Class Certification (Doc. 89) and Motions in Exclude Opinions (Docs. 110; 111) relating to those claims are denied as moot.

## D. Conclusion

To be clear, the Court expresses no opinion on the viability of the state-law claims. Those relate to any past damages Miller and other Dunbar residents may have suffered from the sludge. The Court merely concludes Miller failed to show there is an imminent

and substantial endangerment from the removed sludge now or in the future. If Miller pursues her tort claims, the state court is well suited to resolve them.

Accordingly, it is now

**ORDERED:**

1. Defendants' Motion for Partial Summary Judgment on RCRA (Doc. 115) is **GRANTED**. The Third Amended Complaint (Doc. 100) is **DISMISSED**.

    a. Count 1 is **DISMISSED with prejudice**.

    b. Counts 2-5 are **DISMISSED without prejudice**.

2. Defendants' Motion for Partial Summary Judgment on Plaintiffs' Individual State-Law Claims (Doc. 116) is **DENIED as moot**.

3. Plaintiffs' Motion for Class Certification (Doc. 89) is **DENIED as moot**.

4. Defendants' Motion to Exclude Specific Opinions and Testimony of Plaintiffs' Retained Expert Witness Isidro Duque (Doc. 102) is **DENIED**.

5. Plaintiffs' Motion to Exclude the Opinions and Testimony of Defendants' Retained Expert Matthew Simmons (Doc. 110) is **DENIED as moot**.

6. Defendants' Motion to Exclude Opinions and Testimony of Plaintiffs' Retained Expert Witness Shawn Wilson (Doc. 111) is **DENIED as moot**.

7. Plaintiffs' Motion to Exclude the Opinions of Christopher Teaf (Doc. 112) is **DENIED**.

8. The Clerk is **DIRECTED** to enter judgment, terminate all pending motions and deadlines, and close the file.

**DONE** and **ORDERED** in Fort Myers, Florida this 4th day of January, 2020.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: All Parties of Record